# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| **Complainant** | : | |
| | : | |
| v. | : Case No. 1: 21-575 (JDB) | |
| | : | |
| DAVID JOHN LESPERANCE, CASEY | : | |
| CUSICK, and JAMES VARNELL | : | |
| CUSICK, JR., | : | |
| | : | |
| **Defendants**. | : | : |
| _____ | : | |

## DEFENDANTS TRIAL BRIEF AND OBJECTIONS TO CERTAIN GOVERNMENT EXHIBITS

Defendants herein through the undersigned counsel, John M. Pierce, Esq. presents this Trial

Brief with objections to certain government exhibits, along with various points and authorities.

OBJECTIONS TO CERTAIN IRRELEVANT GOVERNMENT EXHIBITS WHICH DEPICT
EVENTS UNSEEN BY DEFENDANTS AND/OR EVENTS OUTSIDE THE DATES OF THE
ALLEGED OFFENSES

**Gov. Exhibits 220 and 221** is a short (2 seconds) video clip taken by one of the defendants'

phones depicting fencing near the Capitol on **January Seventh**, 2021 while defendants drove

near the Capitol.  (Defendants noticed and filmed <u>the day after January 6 </u>that the government

was erecting fencing around the Capitol <u>the day after the events of January 6.</u>)   For obvious

reasons, this imagery of fencing is irrelevant to the allegations in this trial, would confuse the jury, and would otherwise be unfairly prejudicial even if there were any probative value at all.

**Gov. Exhibit 503** depicts an "AREA CLOSED" sign with officers in the background. It is not taken from any vantage point where defendants saw or experienced. Additionally, the picture likely was taken <u>more than an hour before</u> defendants approached the Capitol grounds on Jan. 6. Defendants object on foundation, relevance, and 403 grounds.



**Gov. Exhibit 504** depicts a violent scene of rioters at the first breach pushing through a barrier and violently attacking a police officer, as smoke billows in the background. This depiction occurred <u>more than an hour before</u> defendants even approached the Capitol grounds. (And defendants did not approach the Capitol at this location in any case.) Defendants did not see any of the material things depicted in the scene, and this violent image is irrelevant, overly prejudicial and misleading under Rules 401 and 403. It also lacks any foundation.



**Gov. Exhibit 505** likewise lacks foundation, is irrelevant, misleading, and is inadmissible under

Rule 403.  This "AREA CLOSED" sign is not taken from defendants' camera or cellphones.



**Gov. Exhibit 154** is an image of police standing outside the Capitol.  It is a "police line" which was never crossed or challenged by defendants.  It lacks foundation, is irrelevant, misleading, and otherwise violates 403 balancing.



**Gov. Exhibit 502** depicts an overhead aerial demonstrative "map" of the Capitol, with a thick red line surrounding certain grounds.  The exhibit is entirely misleading in that it is designed to trick jurors into believing the border line depicts real, secure, barriers or fencing.  But in fact, the red "boundary" line was <u>not secure</u> on January 6, and there were even actual streets and parking areas in which the public could drive in and out of the "red line area" without obstruction.

A demonstrative exhibit depicting dimensional boundaries must be attested to with testimony regarding precise dimensions.  The "red line" area was not a fenced, walled, or barricaded line on January 6.  Inadmissible under 401, foundation, and 403.

THE GOVERNMENT'S ASSERTION OF "RESTRICTED AREAS" DEFIES SETTLED
CASE LAW AS WELL AS THE FACTS OF JANUARY 6.

The government's assertion that defendants knowingly entered and remained in

"restricted areas" appears to rest on nothing but claims that there were barriers or signs placed in

some locations (at some times).  The government will fail to show that defendants crossed over

or through any posted barrier, fence, line of officers, or other boundary.

The government relies on an argument that the Secret Service gets to simply pronounce

arbitrarily that a place is restricted because a protectee may be "visiting."  But where was this

pronouncement ever posted on January 6?  Don't protectees sometimes "visit" sports stadiums to

watch baseball games or football games?  Are such spaces "restricted," and if so, how?  Can the

government simply prosecute and imprison people who come to such locations, upon arbitrary

criteria?

And how can such a construction of principles be reconciled with due process?  Or the

long line of cases holding that people have a right to use the Capitol Grounds as a free speech

forum?  *See Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575 (D.D.C.

1972).  In *Jeannette Rankin Brigade* a special 3-judge panel of the DC District Court held that the

Capitol Grounds are "an area to which access cannot be denied broadly or absolutely." 342 F.

Supp. 575, 583-84 (D.D.C. 1972). The Supreme Court summarily affirmed, making *Jeannette*

*Rankin Brigade* binding precedent. 409 U.S. 972 (1972). Later, in *Community for Creative Non-*

*Violence v. Kerrigan*, the DC Circuit held that "there is no doubt that the Capitol Grounds are a

public forum." 865 F.2d 382, 383, 387 (1989) (upholding "a reasonable time, place or manner

restriction," a regulation limiting the length of time during which demonstration "props and

equipment" may remain on the Grounds). Clearly, therefore, the "Grounds (excluding such

places as the Senate and House floors, committee rooms, etc.) have traditionally been open to the

public," and "the primary purpose for which the Capitol was designed--legislating"--is entirely consistent "with the existence of all parades, assemblages, or processions which may take place on the grounds." *Jeannette Rankin Brigade*, 342 F. Supp. at 584.

Indeed, in *Jeannette Rankin Brigade*, the district court observed that "the fundamental function of a legislature in a democratic society assumes accessibility to [public] opinion." *Id. See also, Lederman v. United States*, 291 F.3d 36 (DC Cir. 2002) (striking down a regulation banning leafleting and other "demonstration activities" on the sidewalk at the foot of the House and Senate steps on the East Front of the Capitol). The *Lederman* Court found that sidewalks around the Capitol are a public forum, and that a regulation banning leafleting and other "demonstration activities" at the foot of the House and Senate steps on the east side of the Capitol is unconstitutional.

Note that courts have held that even the *interior* of the Capitol is an appropriate forum for organized prayer sessions and organized walking through the halls.[1]

---

[1] The First Amendment literally says "Congress shall make no law" restricting speech, advocacy, or petitioning. The government's only path around this problem is the notion that the mere presence of the Vice President in the Capitol on Jan. 6 somehow allows for prosecutions of advocates, protestors or petitioners hundreds of yards away, outside, separated by numerous thick marble walls.

But the Supreme Court has never held that the First Amendment can be evaded simply by a Secret Service proclamation that a protected government official lurks nearby. The government often asserts on Judge Friedman's well-articulated opinion in *Bynum v. U.S. Capitol Police Board*, 93 F. Supp. 2d 50 (D.D.C. 2000), which the government says classified the interior of the Capitol as a nonpublic forum. In fact, *Bynum* struck down a previous ban on picketing and parading in the Capitol as too broad. See id. (holding groups of visitors have 1st amendment rights to hold nondisruptive prayer sessions in Capitol hallways).

Judge Friedman himself wrote that his conclusion to categorize the inside of the Capitol as a 'nonpublic forum' was "somewhat surprising." Id. at 56 ("Which brings the Court to what may seem a somewhat surprising conclusion that the inside of the United States Capitol is a nonpublic forum for First Amendment forum analysis purposes").  And despite the *Bynum* Court's pronouncement that the inside of the Capitol is a nonpublic forum for protesting, the Court held that some, limited expression, prayer and petitioning is nonetheless permitted inside the Capitol:

**No law makes the Capitol a restricted area.  No court case makes the Capitol a restricted area.  No published federal rule or regulation makes the Capitol a restricted area.**

Significantly, no law of Congress makes the Capitol a restricted area.  No detailed court case ever published[2] makes the Capitol a restricted area.  Indeed, these sources of law resoundingly say the opposite.  So how do prosecutors in these cases contend the Capitol or its grounds were restricted areas on Jan. 6?

**Trespass Law requires both proof of notice and proof of actual license to restrict.**

---

The Court, however, cannot conclude that the regulation is reasonable in light of the purposes it could legitimately serve. While the regulation is justified by the need expressed in the statute to prevent disruptive conduct in the Capitol, it sweeps too broadly by inviting the Capitol Police to restrict behavior that is in no way disruptive, such as "speechmaking . . . or other expressive conduct. . . ." Traffic Regulations for the Capitol Grounds § 158. Because the regulation's proscriptions are not limited to the legitimate purposes set forth in the statute, it is an unreasonable and therefore an unconstitutional restriction on speech. *See Board of Airport Commissioners of the City of Los Angeles v. Jews for Jesus, Inc*., 482 U.S. 569, 575 (1987) (general prohibition of First Amendment activity in airport cannot be justified even if airport is nonpublic forum "because no conceivable government interest would justify such an absolute prohibition of speech"). For these reasons, and those discussed in Section II B of this Opinion, the regulation is both unreasonable and unconstitutionally overbroad.

*Bynum*, at 57.

Judge Friedman also found that the "picketing and parading" ban violated due process because it was vague:  "While there certainly are types of expressive acts that rise to the level of a demonstration, any regulation that allows a police officer the unfettered discretion to restrict behavior merely because it 'conveys a message' or because it has a 'propensity to attract a crowd of onlookers' cannot survive a due process challenge." Id.

The regulation as written allows a police officer to restrict any sort of expressive conduct when, in the eyes of the particular officer, it might attract onlookers -- without regard to whether it in fact attracts a crowd of onlookers or whether it in fact disrupts or obstructs. The determination of what conduct is prohibited by such a regulation therefore necessarily will vary depending on the subjective judgment of the particular officer regarding what conduct in his or her judgment has a "propensity to attract a crowd of onlookers." Such a regulation does not provide any standard at all. Rather, it "confers on the police a virtually unrestrained power to arrest and charge persons with a violation" and "the opportunity for abuse . . . is self-evident." [citations omitted].

The virtually standardless, broad discretion given to the Capitol Police by this regulation also causes it to be unconstitutionally vague.

Bynum, at 58-59.

[2] Ironically the only courts that have ever pronounced the Capitol grounds to be a restricted area are some trial courts in Jan. 6 cases.  Most of these rulings are unpublished.

The federal "restricted area" statutes at issue here are analogous to trespassing laws at the state levels. These are derived from ancient common law going back in Anglo-American history for centuries. The basic principles of criminal trespass are enunciated in the Model Penal Code. See, e.g., *State v. Pixley*, 200 A.3d 174 (Vt. 2018). In general, a conviction for trespassing requires <u>two</u> distinct elements: first, the license element—that the person is entering the land "without legal authority" or consent, and second, the notice element—that notice against trespass is provided for the property in question. Id. Said differently, conviction requires <u>proof of both</u> *subjective* notice (the defendant's state of mind) and the *objective* fact of restrictedness. In this case, each element is contested.

It is not enough for "the State to show that defendant should have known he was not licensed or privileged to enter the dwelling." *State v. Fanger*, 665 A.2d 36, 38 (Vt. 1995) (quoting Model Penal Code § 221.2(1) (1962)). The government must prove a <u>defendant actually knew</u>.

Case reporters are filled with cases evincing messy facts which are in some ways analogous to the circumstances of January 6. There are both cases where defendants are convicted of trespassing in circumstances <u>without</u> posted warnings; and other cases where courts hold that even heavily-posted 'no trespassing' areas are <u>not</u> restricted areas. *See, e.g., State v. Carter*, 160 S.W.3d 526, 533 (Tenn. 2005) ("[a] person does not have an expectation of privacy in the area in front of his or her residence leading from the public way to the front door").

The vast majority of states that have directly addressed the issue consider signage to be but one consideration when determining whether a person has demonstrated a legitimate expectation of privacy or restricted area. *See, e.g., Michel v. State*, 961 P.2d 436, 437–38 (Alaska Ct.App.1998) (holding that "[p]ersons visiting the residence for social or commercial purposes"

would not construe "no trespassing" signs along driveway "as meant to prohibit their entry");

*Burdyshaw v. State*, 10 S.W.3d 918, 921 (Ark.Ct.App.2000) ("[E]ven though the property was

posted, the gates were open, the driveway was not blocked, and entry onto the property was not

an intrusion prohibited by the Fourth Amendment."); *Burkholder v. Superior Court*, 96

Cal.App.3d 421, 428 (Cal.Ct.App.1979) (holding that expectation of privacy was objectively

reasonable when "[e]ntry to the property was openly restricted by posted signs along, and locked

gates across[ ] the rural access road signif[ied] an intention to deny access to the public in

general, including government agents").[3]

---

[3] *Brown v. State*, 152 So.3d 619, 624 (Fla.Dist.Ct.App.2014) ("While this Court has found that a policeman may enter the curtilage surrounding a home in the same way as a salesman or visitor could, no such person would reasonably go through both a gated four-foot fence and a gated six-foot fence, surrounded by several 'No Trespassing' signs in order to conduct business with the residents."); *Wysong v. State*, 614 So.2d 670, 671 (Fla.Dist.Ct.App.1993) (holding that officers did not illegally enter yard to knock on door despite "no trespassing" sign); *State v. Rigoulot*, 846 P.2d 918, 923 (Idaho Ct.App.1992) ("Posting 'No Trespassing' signs may indicate a desire to restrict unwanted visitors.... However, such signs cannot reasonably be interpreted to exclude normal, legitimate, inquiries or visits by mail carriers, newspaper deliverers, census takers, [etc.] who restrict their movements to the areas of one's property normally used to approach the home." (citations omitted)); *Mundy v. State*, 21 N.E.3d 114, 118–19 (Ind.Ct.App.2014) (holding that it was unreasonable for officers to enter property when it was posted, there was a chain across the driveway, and a security camera was on a tree near the chain); *State v. Fisher*, 154 P.3d 455, 470–75 (Kan.2007) (ruling that deputy was legally on property to conduct "knock and talk" but could not seize evidence from curtilage; presence of "no trespassing" signs was part of curtilage analysis); *Jones v. State*, 943 A.2d 1, 12 (Md.2008) ("For Fourth Amendment purposes, appellant could not have had a reasonable expectation that the 'No Trespassing' sign would or should prevent visitors with a legitimate purpose from walking to the front door, including police officers in furtherance of an investigation."); *State v. Kruse*, 306 S.W.3d 603, 611–12 (Mo.Ct.App.2010) (stating that signage is one consideration when determining whether police intrusion into backyard was reasonable)); *State v. Pasour*, 741 S.E.2d 323, 326 (N.C.Ct.App.2012) ("[W]hile not dispositive, a homeowner's intent to keep others out and thus evidence of his or her expectation of privacy in an area may be demonstrated by the presence of 'no trespassing' signs". ); *State v. Mittleider*, 809 N.W.2d 303, 307–08 (N.D.2011) (holding that "no trespassing" signs on farm did not create reasonable expectation of privacy in entrance to the farm but leaving open the question of whether such signs could ever create a reasonable expectation of privacy); *State v. Morgan*, No. 13–CA–30, 2014 WL 1836015, at *3–4 (Ohio Ct.App. May 1, 2014) (holding that initial "knock and talk" was "unobjectionable"—despite "no trespassing" signs in front of house but entry into backyard was unreasonable, partly because of the signage), no perm. app. filed ; *State v. Roper*, 294 P.3d 517, 520 (Or.Ct.App.2012) (holding that fence plus signage "objectively manifested intent to exclude the public"); *State v. Gabbard*, 877 P.2d 1217, 1221 (Or.Ct.App.1994) (concluding that "no trespassing" sign on boundary fence, without more, would not have served to exclude the "reasonable visitor ... who desired to contact the residents" and that, therefore, officers could rightfully use driveway to approach house); *Robinson v. Commonwealth*, 639

Michel, 961 P.2d at 438. Likewise, we conclude that the sign in this case would not have

prevented the casual visitor or the reasonably respectful citizen from approaching appellant's

residence. Therefore, the sign did not revoke the implied invitation of the front door, and

Investigators Green and Chunn lawfully entered appellant's property when they drove up his

---

S.E.2d 217, 222 (Va.2007) ("Implied consent can be negated by obvious indicia of restricted access, such as posted 'no trespassing' signs, gates, or other means that deny access to uninvited persons."); *State v. Johnson*, 879 P.2d 984, 992 (Wash.Ct.App.1994) (holding that the defendants manifested "their subjective intent to close their property by fencing it, erecting a gate, and placing signs near the gate saying 'No Trespassing' and 'Private Property.' ").

In addition, the United States Supreme Court in *Oliver v. United States*, when determining whether "no trespassing" signs created a legitimate expectation of privacy in open fields when there would otherwise be no expectation of privacy stated, "Certainly the Framers did not intend that the Fourth Amendment should shelter criminal activity wherever persons with criminal intent choose to erect barriers and post 'No Trespassing' signs." *Oliver*, 466 U.S. at 183 n.13. Even under the Jardines search test, which focuses more on trespass law than on expectation of privacy, the officers' actions in merely conducting a "knock and talk" would not be proscribed as a warrantless search. *See Jardines*, 1415–18 (ruling that bringing a drug-sniffing canine into defendant's curtilage objectively demonstrated that the police were intruding upon a constitutionally protected area to search, not merely conducting a "knock and talk"). "The law of trespass generally gives members of the public a license to use a walkway to approach the front door of a house and to remain there for a brief time." Id. at 1420 (Alito, J., dissenting). Consequently, if the officers' actions were not a search, then the Fourth Amendment protections would not apply.

Taking all of these cases into consideration, the emerging rule appears to be that the implied invitation of the front door can be revoked but that the revocation must be obvious to the casual visitor who wishes only to contact the residents of a property. *See State v. Grice*, 767 S.E.2d 312, 319 (N.C.2015) ("The implicit license enjoyed by law enforcement and citizens alike to approach the front doors of homes may be limited or rescinded by clear demonstrations by the homeowners and is already limited by our social customs."). Thus, in this case, we must determine whether a small sign reading "no trespassing[,] hunting[,] or fishing," posted in a field next to appellant's driveway that is difficult to see when driving down the driveway, as evidenced by the "dashcam" video presented in this case, is sufficient to revoke the implied invitation. *See, e.g., U.S. v. Ventling*, 678 F.2d 63, 66 (8th Cir.1982); Michel, 961 P.2d at 438. Several courts when ruling on this issue have noted that such a sign, especially on a rural property, is generally intended to prevent people from unauthorized use of the property, not to prevent a casual visitor from approaching the residence) *Ventling*, 678 F.2d at 66.

driveway and approached his front door. See also *Borrico v. State*, 276 So.3d 458 (Florida App.

2019) (overturning conviction where evidence of notice was confusing, contradictory or

nonexistent).

**The presence of so many hundreds of others around defendants who regarded the area as unrestricted also contributed to defendants' innocent states of mind regarding the restrictedness or nonrestrictedness of the area.**

Grounds in frequent use by pedestrians, such as the Capitol grounds, become a right-of-

way over time. *See, e.g., McKinnon v. Northeast Illinois Regional Commuter R.R. Corp*., 263 Ill.

App. 3d 774, 779 (1994) (reversing the trial court's dismissal where complaint alleged that there

was a particular right-of-way extending through a densely populated village that was easily

accessible to the public and that the defendant permitted the use of the right-of-way to the extent

that it became the custom of persons to do so).  So it is that defendants' assessments that

hundreds of people around them who evidently believed they were rightfully in the area is a

defense.

The case law regarding the open-public-free-speech-forum area of the Capitol cannot be

overcome by mere decree of the Capitol Police, or the Secret Service, or federal prosecutors.

The U.S. Capitol is one of America's largest public buildings, with well over 1.5 million square

feet, over 600 rooms, and miles of corridors.[4] Previous case law in other federal jurisdictions has

invalidated government attempts to extend no-advocacy zones beyond a few feet.

For example, the Supreme Court invalidated attempts to ban protesting within 300 feet of

an abortion clinic. *Madsen v. Women's Health Ctr*., 512 U.S. 753, 771 (1994) (finding thirty-six-

foot buffer was acceptable).  "[C]itizens must tolerate insulting, and even outrageous, speech in

_____

[4] See Architect of the Capitol, "U.S. Capitol Building," https://www.aoc.gov/explore-capitol-campus/buildings-grounds/capitol-building (accessed 9/27/2022).

order to provide adequate breathing space to freedoms protected by the First Amendment." *Id.* at 774.

**The First Amendment as a Defense to trespass.**

In general, violence is not First-Amendment protected.  But trespassing sometimes is. For example, in *People v. Millhollen*, 5 Misc. 3d 810, 786 N.Y.S.2d 703, 194 Ed. Law Rep. 395 (N.Y. City Ct. 2004) a court held that a university student who climbed a tree on a university campus, and remained there after being ordered by a police officer and a university official to descend, was not guilty of trespass, absent evidence that the student's presence in the tree was incompatible with the university's normal activities).

The government contends that there is no First Amendment protection for the thousands of people present on Capitol Grounds on January 6.  None.  But given the binding case law holding that the Capitol grounds is a public free-speech forum, the government's claims that the grounds were totally restricted on Jan. 6 must withstand strict scrutiny analysis.  And the evidence in this case illustrates the presence of flags, banners, megaphones, and group persuasive chants—all of which are archetypes of protected petitioning and advocacy rather than assaultive militancy.

A policy, law, barrier, or forum restriction that regulates protected speech must meet First Amendment muster, whether or not it also regulates conduct. *See ACLU of Ill. v. Alvarez*, 679 F.3d 583, 602 (7th Cir. 2012) ("When the expressive element of an expressive activity triggers the application of a general law, First Amendment interests are in play."); *Bartnicki v. Vopper*, 200 F.3d 109, 121 (3d Cir. 1999) (rejecting the argument "that a statute that governs both pure speech and conduct merits less First Amendment scrutiny than one that regulates speech

alone."). The inquiry "is not whether trespassing is protected conduct," but whether the law

contains other restrictions on conduct that also "qualif[y] as protected speech." *Animal Legal

Def. Fund v. Kelly*, 9 F.4th 1219, 1228 (10th Cir. 2021) (quoting *W. Watersheds Project v.

Michael*, 869 F.3d 1189, 1194–96 (10th Cir. 2017) (*W. Watersheds Project I*)).

      This conclusion is consistent with Supreme Court precedent which has emphasized that

First Amendment analysis applies when speech is implicated by a law even if the law "generally

functions as a regulation of conduct." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27–28

(2010) (emphasis in original). Thus, the erection of barriers on Capitol grounds regulates

protected speech and accordingly implicates the First Amendment.  Exempting the Jan. 6

demonstration from any First Amendment review could result in the criminalization of core free

speech, such as criticism of a politician. *See Animal Legal Def. Fund v. Herbert*, 263 F. Supp. 3d

1193, 1209 (D. Utah 2017) (observing "[i]f a person's First Amendment rights were extinguished

the moment she stepped foot on [a given property], the State could, for example, criminalize any

criticism of the Governor, or any discussion about the opposition party, or any talk of politics

whatsoever, if done on [a given] property.").

      Some acts amount to speech protected by the First Amendment, and may not be

prosecuted as trespass, depending on the location of the protest.  The Supreme Court of the

United States has held that since 'time out of mind,' public streets and sidewalks have been used

for public assembly and debate, the hallmarks of a traditional public forum." *Frisby v. Schultz*,

487 U.S. 474, 480 (1988). In this regard, the right of free speech attaches to premises which have

traditionally served as a place for free public assembly by private citizens. *People v. O'Grady*,

147 Misc. 2d 118, 560 N.Y.S.2d 602 (App. Term 1990). And courts have previously held that

the Capitol grounds on all sides of the building are just such a free speech forum. *See Jeannette*

*Rankin Brigade, supra*. The government's claim that all of the demonstrators on Capitol Grounds on Jan. 6 were "attackers" rather than protestors conflicts with settled First Amendment law.

**A Court Holding that the Hundreds of Protestors on January 6 have no First Amendment Protection will have a Chilling Effect on Fundamental First Amendment Protections.**

Of all the First Amendment cases ever decided by the Supreme Court, the case of *Adderley v. State of Fla*., 385 U.S. 39, 48 (1966) may provide the clearest path for analysis. In *Adderly*, the Court upheld the trespassing arrest of 13 college students who entered the grounds of the Leon County, Florida jail to protest prior arrests and city segregation policies. The students blocked a driveway to the jail entrance not normally used by the public and refused to disperse after being ordered by sheriff. Significantly, the majority opinion authored by Justice Black indicated that the same facts *would lead to First Amendment protection from a trespass conviction* if the facility had been a capitol with a history of political protest and speech advocacy.

The dissenting opinion in *Adderley v. State of Fla*., authored by Justice Douglas and joined by Brennan and Fortus, found that the student protestors' trespassing arrests should be overturned on First Amendment grounds. 385 U.S. 39, 48 (1966) (Douglas, J., dissenting). "We do violence to the First Amendment when we permit this 'petition for redress of grievances' to be turned into a trespass action," wrote the dissenters. *Id*. at 52.

The parallels between the *Adderly* case and January 6 could not be more compelling. In fact, there was evidence in the *Adderly* case that workers in the jail were obstructed and afraid to leave the jail facility during the protest. And in some ways, the disruption of the Leon County

jail by the *Adderly* protestors was less supported by the law than the protests of January 6.[5]  Even so, three Supreme Court justices pronounced that the student protestors' conduct was First Amendment protected. "In the first place the jailhouse grounds were not marked with 'NO TRESPASSING!' signs," wrote Douglas, *id*. at 52, and "[o]nly the sheriff's fiat [ordering trespassers to disperse" transformed lawful conduct into an unlawful trespass." *Id*.

Three members of the Supreme Court held in 1966 that protestors who entered the grounds of a jail—which (unlike Capitol Grounds) had never been a forum for free speech— blocked traffic, prevented a worker from leaving, and defied orders from a sheriff to disperse were <u>fully protected</u> by the First Amendment.  And <u>*every member of the Supreme Court*</u> held that the First Amendment would have protected the protestors from a trespassing conviction under the same facts *if the facility had been a capitol rather than a jail.*[6]

Justice Douglas cited numerous Supreme Court cases standing for the proposition that the 'custodian' of public property cannot arbitrarily decide "when public places shall be used for the

---

[5] **"The fact that no one gave a formal speech, that no elaborate handbills were distributed, and that the group was not laden with signs would seem to be immaterial" to the question of First Amendment protection, wrote the dissent.  Justice Douglas wrote that the First Amendment protected the *Adderly* protestors nonetheless. Id. at 51.**
[6] The Court compared the jail protest with the protest upheld in *Edwards v. South Carolina*, 372 U.S., at 235, 83 S.Ct., at 683 (1963). In *Edwards*, the Supreme Court overturned convictions of protestors at a state capitol who refused commands to disperse.

> In *Edwards*, the demonstrators went to the South Carolina State Capital grounds to protest. In this case they went to the jail. Traditionally, state capitol grounds are open to the public. Jails, built for security purposes, are not. The demonstrators at the South Carolina Capital went in through a public driveway and as they entered they were told by state officials there that they had a right as citizens to go through the State House grounds as long as they were peaceful. Here the demonstrators entered the jail grounds through a driveway used only for jail purposes and without warning to or permission from the sheriff.

Adderly at 41.
> The dissent even gently mocked the majority's proffered distinction between jail grounds and legislative grounds. "Would the case be any different if, as is common, the demonstration took place outside a building which housed both the jail and the legislative body? I think not." *Id*. at 53 (Douglas, J. dissenting).

communication of ideas," e.g., Hague v. C.I.O. 307 U.S. 496 (1939); Schneider v. State of New

Jersey, 308 U.S. 147, 163—164; Cantwell v. State of Connecticut, 310 U.S. 296; Largent v. State

of Texas, 318 U.S. 418; Niemotko v. State of Maryland, 340 U.S. 268; Shuttlesworth v. City of

Birmingham, 382 U.S. 87. "For to place such discretion in any public official, be he the

'custodian' of the public property or the local police commissioner (cf. *Kunz v. People of State of*

*New York*, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280), is to place those who assert their First

Amendment rights at his mercy." Id. at 54. "It gives him the awesome power to decide whose

ideas may be expressed and who shall be denied a place to air their claims and petition their

government." Id.

### A.    USCP OFFICERS CAN AND DID AUTHORIZE ENTRY TO CAPITOL

On its face, 18 U.S.C. 1752 allows a police officer to authorize entry into a restricted

building or grounds.  The statute states in relevant part that:

18 U.S.C. § 1752(a)(1) *(emphases added).*

**(a)**Whoever—
**(1)**  *__knowingly__* enters or remains in any restricted building or
grounds *__without lawful authority to do so;__*

\* \* \*

[shall be punished]

\* \* \*

It is clear error to assert that a law enforcement officer cannot [7] render lawful what would

otherwise be lawful.  Such an argument is untenable, when the face of the statute says otherwise.

---

[7]    Defendants and counsel do not see the relevance of an estoppel argument arises from
President Donald Trump's speech.  First, Trump did not tell anyone to go the Capitol but
remarked in effect "I know many of you are going to the Capitol" because rallies were
announced in December 2020.  Second, most people could not understand Trump's remarks at
the Ellipse rally due to the blustering wind and malfunctioning public address speakers.  See:
Audio problems at: https://www.youtube.com/watch?v=MjBx58tQagU

Clearly, any person may enter "a restricted building or grounds" if authorized to do so. That is the plain text of the statute, beyond dispute and unarguable.

For example, Luke Mogelson, Reporter for <u>The New Yorker Magazine</u>, spent considerable time inside the U.S. Capitol building, and reported his observations in widely publicized articles.  See, e., g.,  **"A Reporter's Video from Inside the Capitol Siege,"** [https://www.newyorker.com/video/watch/a-reporters-footage-from-inside-the-capitol-siege](https://www.newyorker.com/video/watch/a-reporters-footage-from-inside-the-capitol-siege) . Reporter Mogelson was not arrested for being in the U.S. Capitol, but his reporting was celebrated.  He was allowed into the Capitol building.

The Government would invite us to envision that "lawful authority" to enter a restricted area under 18 U.S.C. 1752 requires some type of authority that not even the then-President of the United States could grant.  Without "lawful authority" is not clarified.  Any person responsible for supervising real estate has the power to invite or allow a person to enter that real estate.

Therefore, if a "sworn" (commissioned) U.S. Capitol Police officer confirms to these Defendants that they may enter the building – whether others like that decision or not – then the Defendants entered the U.S. Capitol building with  ***<u>lawful authority to do so."</u>***

Any person allowed into the U.S. Capitol building by a U.S. Capitol police officer has committed no crime.

### B.  18 U.S.C. 1752 IS NOT A GENERIC TRESPASSING STATUTE

Under 18 U.S.C. 1752, the exact same conduct prohibited on a Tuesday may be completely permitted on a Wednesday – in the same location.  This is not a law against trespassing.  It is a law vaguely related to a Secret Service protectee.  The same location that may involve a protectee on a Tuesday may be unrestricted the following day on a Wednesday.

Defendants are charged with ***<u>knowingly</u>*** entering a grounds or building restricted ***<u>within</u>***

_**the limited meaning**_ of 18 U.S.C. 1752. [8]  The statute does not restrict presence near a crowd engaging in disorder nor require a person to depart an area where there is some chaos or misbehavior.  It does not prohibit citizens from seeing police officers or hearing alarms.  This is not an "If you see police, you must run away" statute.

For example, it is often claimed that the U.S. Capitol had been closed due to COVID.  But 18 U.S.C. 1752 does not apply to a building closed due to COVID.

If the central Virginia earthquake of 2011 that damaged the spires of the National Cathedral had required the closure of the U.S. Capitol building, entering would not be a violation of 18 U.S.C. 1752.  There might be some other law that restricts entry into a building closed due to structural damage or uncertainty.  But 18 U.S.C. 1752 would not be the right statute.

In making this mistake, the Government argues in its Opposition:

> As they approached the Capitol building, the defendants walked by unmistakable signs that they were not allowed to be within that restricted area, including, but not limited to, officers carrying shields and batons and at least one officer deploying a "flashbang" device.

Setting aside ambiguity of the word "signs," the Government Opposition suggests that if a person sees officers carrying shields or batons this is the same as a legally-effective declaration of a restricted building or grounds under 18 U.S.C. 1752.  It is not.

The Government Opposition suggests that if a person sees an officer using a flashbang this is the same as a legally-effective declaration of a restricted building or grounds under 18 U.S.C. 1752.  It is not.  Witnessing the use of a flashbang is not a violation of 18 U.S.C. 1752.

---

[8]      Commonly referred to as a "restricted area" though the statute refers to buildings or "grounds."  In the absence of definition that could mean anything from the 161,000 acres of Fort Bragg to a townhouse backyard.  The fact that the statute refers to undefined "grounds" is the source of many difficulties.  For example, if the entire District of Columbia were empty the Secret Service's job would be easier.  The centrality of cross-examining any (potential) Secret Service witness on the size and scope of a validly restricted area is a necessary topic.

Moreover, this would not identify the ***boundaries*** of a restricted area.  Unless a person knows where the boundary line is, and knows that on one side of the line they are permitted but on the other side of the line they are forbidden, no restricted area can exist.

### C.  THEREFORE, U.S. CAPITOL POLICE INVITED DEFENDANTS

Indeed, the U.S. Capitol Police issued six (6) different permits for demonstrations to be held on the U.S. Capitol Grounds on the afternoon of January 6, 2021, simultaneous with the meeting of the Joint Session of Congress.  See permits issued by Scott Grossi of the U.S. Capitol Police, hyperlinked from each item on the list below.

Brian Lewis Demo Pemit

Jesus Lives Demo Permit

One Nation Under God Permit

Rock Ministries Demo Permit

Virginia Freedom Keepers Demo Permit

Women For a Great America Demo Permit

Thus, not only were there no notices to legally effect a restriction, but the U.S. Capitol Police affirmatively ***invited*** demonstrators onto the U.S. Capitol Grounds to attend any or all of six (6) different demonstrations.

### D.  SPECULATION AND CONJECTURE VIOLATE BURDEN OF PROOF

The Government's Opposition misperceives the Defendants' Motion, arguing that:

> Defendants contend that, because the government purportedly "has alleged no facts of [the] crime[s]" charged in the Information (ECF No. 60 at 8-9), it will improperly resort to "conjecture," "speculation," and "guilt by association." Id. at 8-11.

Defendants filed their motion in limine to prohibit conjecture, speculation, and guilt by association because these are always improper but have been prominent parts of the U.S. Attorney's Office's prosecutions of other January 6 Defendants.  The issue is not the Government's charging documents.  Conjecture, speculation, and guilt by association are always improper because they violate the requirement that Defendants are presumed innocent until proven guilty beyond a reasonable doubt.  Inadequacies in charging documents are not relevant to that discussion in this context.

Demonstrating that the concern is genuine, the Government's Opposition goes on to argue *(emphases added):*

> At trial, the government expects to prove its case primarily through video and photographic evidence of the defendants' actions on January 6, 2021, evidence of their communications and statements before and after that day, ***and contextual testimony and exhibits of the events*** that took place at the Capitol in connection with the riot that the defendants joined. Such evidence is clearly relevant to establishing the defendants' conduct and intent on January 6.

The Government's Opposition further argues *(emphases added):*

> Moreover, ***overview exhibits and testimony—already used at dozens of other January 6 trials—will be presented for context*** and to help demonstrate that the defendants' conduct occurred within restricted grounds (Counts One and Two), in a Capitol Building (Counts Three and Four), ***and with intent to impede or disrupt government business and Congress*** (Counts Two and Three).

The Government intends to focus on what other people did that day, rather than what the Defendants did.  This "context" evidence is the "guilt by association" which is objected to.

Such a collectivist guilt can never be acceptable within the criminal jurisprudence of the United States of America.  This is a departure from centuries of Anglo-American jurisprudence. The Government must prove individual guilt by the individual actions of a particular Defendant.

A further flaw metaphor is that these raindrops arrived *after* the baseball game had

already been called for rain.  There are no raindrops that can travel through time.

Dated:  July 10, 2023                              RESPECTFULLY SUBMITTED

                                                   **DAVID LESPERANCE,**
                                                   CASEY CUSICK, and
                                                   JAMES VARNELL CUSICK, JR.,
                                                                 *By Counsel*


                                                   _____/s/_____

                                                        John M. Pierce, Esq.


                                                   John M. Pierce, Esq.
                                                   John Pierce Law Firm
                                                   21550 Oxnard Street
                                                   3rd Floor, PMB #172
                                                   Woodland Hills, CA 91367
                                                   Tel: (213) 400-0725
                                                   Email: *jpierce@johnpiercelaw.com*


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document is being filed on this July 10, 2023, with the Clerk of the Court by using the U.S. District Court for the District of Columbia's CM/ECF system, which will send an electronic copy of to the following CM/ECF participants.

                                                   _____/s/_____

                                                        John M. Pierce, Esq.