**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-575-02 (JDB)** |
| **v.** | : | |
| | : | |
| **CASEY CUSICK** | : | |
| | : | |
| **Defendant** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Casey Cusick to nine months of incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution. The government's recommended sentence is at the midpoint of the 6- to 12-month guideline range calculated by the government and the United States Probation Office.

### I. Introduction

Defendant Casey Cusick ("C. Cusick"), a 38-year-old unemployed resident of Oklahoma, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

After a jury trial, C. Cusick was convicted of entering or remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1); disorderly or disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2); disorderly or disruptive conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  As explained in more detail herein, a sentence of nine of months of incarceration, at the midpoint of the applicable Guidelines range, is appropriate in this case for multiple reasons.  *First*, on January 6, 2021., C. Cusick decided to unlawfully enter the Capitol's restricted area—and then the Capitol building—knowing full well that the certification of the electoral college vote was supposed to take place at the U.S. Capitol that day.  *Second*, C. Cusick chose to enter the Capitol despite seeing rioters climbing the Capitol's outer walls, and seeing scores of officers converging on the Capitol just as he and his companions were about to enter, and despite seeing shattered glass panes near the Senate Wing Door and hearing a blaring alarm sound.  *Third*, C. Cusick not only participated in the riot—he memorialized the occasion by recording video inside the Capitol building.  And *fourth*, this is not C. Cusick's first brush with the law, having previously been convicted of disorderly conduct in connection with an act of domestic violence against his wife in 2018.

The Court must also consider that C. Cusick's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings.  Here, the facts and circumstances of C. Cusick's crime support a sentence of nine months in prison.

---

million) as reflected in this memorandum.  However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.      Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary repetition, the government refers to the general summary of the attack on the U.S. Capitol set forth in the Presentence Report.  PSR (ECF No. 114) at ¶¶ 12-18.

***Defendant C. Cusick's Role in the January 6, 2021 Attack on the Capitol***

On January 5, 2021, C. Cusick traveled with his co-defendants— his father, James Varnell Cusick, Jr., and family friend, David John Lesperance— from his home, which at the time was in Florida, to Washington, D.C. to protest the results of the 2020 presidential election.  C. Cusick believed the election had been "stolen."  Trial Tr. at 609-610, 650.  So, on the morning of January 6, C. Cusick and his co-defendants went to the Ellipse to hear the former President speak at the "Stop the Steal" rally.  From there, the three started making their way towards the Capitol grounds, approaching from the west.  C. Cusick was fully aware that, on that day, Congress was supposed to convene at the Capitol to certify the results of the 2020 presidential election.  *Id.* at 650.

As the three advanced towards the Capitol building, Lesperance was recording the group's progress on his cell phone.  *See* GEX 206-208.  The trio saw unmistakable signs that a violent riot was unfolding at the Capitol.  They walked right by the remnants of snow fencing that had been used to protect the restricted area around the Capitol.  C. Cusick and his co-defendants ignored the torn-up barrier and continued toward the Capitol building.



**Figure 1: Screenshot from Lesperance's
cell phone video (GEX 206 at 1:49)**

A few seconds later, C. Cusick turned to his father and Lesperance and exclaimed, evidently in disbelief: "Whoa.  Someone just fell from the wall!  Someone fell from the top of the wall!"  GEX 206 (2:00 – 2:04).  Lesperance, who was focused on a different rioter, initially disagreed: "No, he's hanging on the edge.  He's there.  He's still there."  GEX 206 (2:04 – 2:16). After some more debate about who had fallen off and who was still hanging, and after joining in other rioters' chants, the three reached the outer wall of the Upper West Terrace.  GEX 207 (0:01 – 0:25).



**Figure 2: Screenshot from Lesperance's
cell phone video (GEX 207 at 0:20)**

From the west front, the Cusicks and Lesperance made their way up the Capitol's front steps and on to the Upper West Terrace.  Along the way, they walked past a set of bike racks that Capitol Police had used as barricades.  GEX 208 (0:25 to 0:35).  At least one of those barricades still bore an "Area Closed" warning sign.   As they did so, they came within a few yards of a large line of police officers who were converging on the Capitol.  The Cusicks and Lesperance pressed on.

 

**Figure 3: Screenshot from Lesperance's cell phone video showing barricades and an "AREA CLOSED" sign (GEX 208 at 0:31)**     **Figure 4: Screenshot from Lesperance's cell phone video showing officers in riot helmets entering the Capitol (GEX 208 at 2:19)**

C. Cuisck, who wore a black jacket and a red beanie style hat, and his co-defendants entered the Capitol building at 3:09 p.m. through the Senate Wing Door.  Just moments earlier, Lesperance had taken a photograph of J. Cusick, against the backdrop of a shattered window.   As J. Cusick was walking into the Capitol building, his son C. Cusick—who was following close behind—exclaimed, "Pepper spray, Dad!"  GEX 211 (at 0:01 to 0:05).  Inside the Capitol, the Cusicks and Lesperance were faced with a line of police officers in riot gear.  They also heard a piercing alarm sound, which had been triggered by the emergency exit-only door through which they had entered. They proceeded nonetheless.

 

**Figure 5: Photo of J. Cusick from Lesperance's iCloud account (GEX 228)**   **Figure 6: Screenshot from USCP surveillance video showing C. Cusick (red circle) as he entered the Capitol (GEX 101A, p. 1, at 3:09:47 p.m.)**

Once inside, the Cusicks and Lesperance turned away from the line of police officers and towards the center of the Capitol. They walked south through the Small Rotunda, the Crypt, the Memorial Door lobby, and the House Wing Doors, which are located on the opposite side of the Capitol building. Shortly thereafter, C. Cusick and his companions turned around and began retracing the same route. Once again, they passed a group of police officers.



**Figure 7: Screenshot from USCP surveillance video (GEX 105A, p. 2, at 3:13:32 p.m.)**

Once back in the Crypt, the trio spent several minutes together before briefly separating, as J. Cusick looked for a bathroom. All three defendants ultimately ended up back at the Senate

Wing Doors.  J. Cusick exited at 3:20 p.m.  Lesperance and C. Cusick exited together shortly thereafter at 3:24 p.m., 15 minutes after they had entered.  On their way out, all three were again surrounded by Capitol Police officers in riot gear, who were actively channeling the crowd out of the Capitol building.



**Figure 8: Screenshot from USCP surveillance video**
**(GEX 101 at 12:09, 3:24:31 p.m. on 1/6/21)**

When the defendants left the Capitol building, they did not leave the Capitol grounds. Instead, they remained on the Upper West Terrace for approximately one more hour – until a large number of police officers in riot gear cleared the area at about 4:30 p.m.  As the defendants remained on the Upper West Terrace, Lesperance recorded more videos on his cell phone.  *See, e.g.*, GEX 218 (cell phone video from Lesperance's iCloud account recorded at 3:04:37 p.m., showing a line of police officers in riot gear starting to clear the Upper West Terrace), GEX 219 (cell phone video from Lesperance's iCloud account recorded at 4:25:26 p.m., still showing the Upper West Terrace).

8

The following day, on January 7, 2021, the Cusicks and Lesperance returned to the edge of the Capitol, as they drove by the United States Supreme Court on the east side of the Capitol. Once on site, Lesperance again used his cell phone to memorialize the scene. This time, Lesperance's videos showed an eight-foot, unscalable fence, which the Capitol Police had erected overnight to protect the United States Capitol in the wake of the January 6 attack. *See* GEX 221-223; Trial Tr. 345-348, 459-460, 499-500.

Since January 2023, C. Cusick has appeared in numerous podcasts and recorded interviews in which he discussed the January 6 attack on the Capitol.[2] In June 2023, for example, C. Cusick recorded a podcast with his father and codefendant, J. Cusick, in observance of Father's Day. *See* The Watchmen, *Father's Day Special* (2023), https://podcasters.spotify.com/pod/show/casey756/episodes/Fathers-Day-Special-e25qljl. Substantial portions of the podcast are devoted to discussing the pair's participation in the January 6 attack. In another lengthy podcast, C. Casey claimed, among other things, that he decided to enter the Capitol building because he "had to use the restroom." The Allcast, Casey Cusick January 6 (2023), https://theallcast.castos.com/episodes/episode-15-casey-cusick-january-6th (56:10 to 57:15). He also suggested that, when he asked a police officer inside the Capitol for

---

[2]  *See, e.g.,* The Watchmen, Father's Day Special (2023), https://podcasters.spotify.com/pod/show/casey756/episodes/Fathers-Day-Special-e25qljl (last visited Oct. 3, 2023); The Allcast, Casey Cusick January 6 (2023), https://theallcast.castos.com/episodes/episode-15-casey-cusick-january-6th (last visited Oct. 2, 2023); The Mel K Show, Mel K & Jan 6 Defendant Casey Cusick: Persecuted Patriot Reveals All (2023), https://themelkshow.com/mel-k-jan-6-defendant-casey-cusick-persecuted-patriot-reveals-all-2-22-23/ (last visited Oct. 3, 2023); – The Awake Awake Podcast, What Really Happened January 6? Casey Cusick (2023), https://podcasts.apple.com/us/podcast/what-really-happened-january-6-casey-cusick/id1648212789?i=1000604569799 (last visited Oct. 3, 2023).

directions, the officer directed him "deeper into the place" toward "the floor of Congress"—advice that C. Cusick assertedly found suspicious and did not follow.  *Id.* (57:15 to 58:30).

### *The Charges and the Trial*

On June 21, 2021, the United States charged C. Cusick by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On June 24, 2021, law enforcement officers arrested him in Palm Bay, Florida.  On September 23, 2021, the United States charged Casey Cusick, James Varnell Cusick, Jr., and David John Lesperance in a four-count Information with entering or remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count One); disorderly or disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Two); disorderly or disruptive conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Three); and parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Four).  After pretrial proceedings, the Court set a jury trial for July 10, 2023.  After a five-day trial and brief deliberations, the jury found all defendants guilty on all counts.  (ECF Nos. 99, 101, 103).

At trial, C. Cusick took the stand in his defense.  C. Cusick admitted that he knew that, on January 6, Congress was supposed to certify the Electoral College.  Trial Tr. 608-609, 649-650.  He also admitted that, as he approached the Capitol, he saw rioters climbing the wall leading to the Upper West Terrace (*id.* at 631-632, 663-664) and a shattered window next to the Senate Wing Door (*id.* at 658).  He also admitted that, once inside the Capitol, he could hear a blaring alarm sound (*id.* at 635, 669), smelled "something sour" (*id.* at 670-672), and exclaimed "Pepper spray, Dad" (*id.* at 636, 670-672).  And C. Cusick testified that, during a domestic dispute in 2018, he

struck his wife in the face with his elbow, as he was driving his wife and infant daughter back home from the airport. *Id.* at 606-608, 678-688.[3]

But C. Cusick also made numerous outlandish—if not outright false—assertions. For example, he claimed that seeing people climbing the Capitol's perimeter walls when Congress was supposed to certify the Electoral College vote did not give him pause because he himself "wasn't that guy." Trial Tr. 632, 664. In explaining his decision to enter the Capitol, C. Cusick claimed, primarily, that he "had to go to the restroom" and, by then, he had seen other rioters enter and exit the Capitol without suffering any consequences. *Id.* at 633-634. He also testified that he did not find it irregular that he was able to enter the Capitol without any screening because "you see it on TV all the time there's people that walk into the Capitol without being screened in order to protest." *Id.* at 657. He testified that he "was not alarmed by the alarm" because he had "traveled the world before with [his] dad, and you're in foreign countries and there could be alarms that go off in hotels." *Id.* at 669. And while he admitted striking his wife in 2018, at trial, he also downplayed the event as his "elbow just coincidentally hit[ting] her right in the perfect spot for her nose to bleed." *Id.* at 679.

As noted, after brief deliberations, the jury found C. Cusick guilty on all counts.

### III.    Statutory Penalties

C. Cusick now faces sentencing on four misdemeanor offenses: entering or remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count One); disorderly or disruptive conduct in a restricted building or grounds, 18 U.S.C. § 1752(a)(2) (Count Two); disorderly or disruptive conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D)

---

[3] C. Cusick nonetheless called his wife Ruth Casey as a character witness at trial. Trial Tr. 582-601.

(Count Three); and parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Four).  As noted by U.S. Probation Office, C. Cusick faces up to one year of imprisonment, one year of supervised release, and a fine of up to $100,000 on Counts One and Two (*see* 18 U.S.C. §§ 1752(b)(2), 3571(b)(5), and 18 U.S.C. § 3583(b)(3)) and up to six months of imprisonment and a fine of up to $5,000 on Counts Three and Fourth (*see* 40 U.S.C. § 5109(b) and 18 U.S.C. § 3571(b)(6)).

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated C. Cusick's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4) | 10 |
| Adjusted Offense Level (Subtotal) | 10 |
| Total Offense Level: | 10 |

*See* PSR at ¶¶ 35-41.[4]

---

[4] The U.S. Probation correctly concluded that C. Cusick's total offense level for Counts One and Two is 10 because (i) Counts One and Two are grouped together under the Guidelines (*see* U.S.S.G. § 3D1.2; PSR at ¶ 41); (ii) while the Statutory Appendix lists two guidelines for Section 1752 offenses (U.S.S.G. §2A2.4 (Obstructing or Impeding Officers) and §2B2.3 (Trespass)), the "most appropriate" guideline (U.S.S.G. §1B1.2 n.1) for the offense conduct charged in Count

The U.S. Probation Office calculated C. Cusick's criminal history as a category I, which is undisputed. Accordingly, C. Cusick is subject to an advisory Guidelines imprisonment range of 6 to 12 months, as the U.S. Probation Office correctly determined. PSR at ¶ 83.

## IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of nine months of incarceration, to be followed by one year of supervised release, and $500 in restitution.

### A.   The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at \*5 (D.D.C. Dec. 28, 2021). While assessing C. Cusick's participation in that attack to fashion a just sentence, this Court should consider various

---

Two—which requires proof of "disorderly or disruptive" committed "with intent to impede or disrupt the orderly conduct of Government business or official functions," 18 U.S.C. § 1752(a)(2)—is Guidelines §2A2.4 (PSR at ¶ 39); and (iii) Count Two's resulting total offense level (10) is higher than the total offense level for Count One alone (6). Nonetheless, for the sake of completeness, the government also sets forth the offense level computation for Count One alone:

| | |
|---|---|
| **Base Offense Level**: The most applicable guideline for Count One is § 2B2.3 (Trespass). | 4 |
| **Specific Offense Characteristics**: On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). Therefore, a two-level enhancement applies. USSG § 2B2.3(b)(1)(A)(vii). | +2 |
| **Adjusted Offense Level (Subtotal):** | 6 |
| **Total Offense Level** | 6 |

aggravating and mitigating factors.  Notably, for a misdemeanor defendant like C. Cusick, the absence of violent or destructive acts on January 6 is not a mitigating factor.  Had C. Cusick engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in this case is C. Cusick's acute awareness, at the time of his offenses, that his conduct would result in the delay of Congress' certification of the Electoral College vote.  As he made his way to the Capitol, C. Cusick chose to ignore the violence and mayhem. And C. Cusick's conduct after January 6 is aggravating.  As noted, C. Cusick returned to the scene of the riot the following day, on January 7.  Together, these factors establish the clear need for a sentence of at least nine months of incarceration.

### B.  C. Cusick's History and Characteristics

C. Cusick, who is 38 years old, is married with three children and currently resides in Oklahoma. PSR at ¶ 57, 60.  This is not C. Cusick's first conviction.  In 2018, C. Cusick "elbowed" his wife in the nose during an argument, causing her nose to bleed.  Trial Tr. at 677-679.  Contrary to C. Cusick's attempt at trial to downplay his blow to his wife's face (and his wife's injuries) as "coincidental[]," C. Cusick ultimately pleaded guilty to a charge of disorderly conduct based on that incident.  *Id*.

Moreover, C. Cusick testified at trial that he visited the Capitol "more than ten" times.  *Id*. at 642.  He was therefore well aware of the sanctity of the Capitol building.  Nonetheless, he chose to participate in a riot that threatened one of Congress's core functions—certifying the electoral vote.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration,

as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others?  Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur.  And if people start to get the

impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a meaningful term of incarceration. C. Cusick admitted to seeing someone fall from a wall outside of the Capitol, and yet he continued. Trial Tr. at 631-632. He saw the broken window before entering the Capitol, but he was undeterred. *Id*. at 658-659. And the loud, blaring alarm that C. Cusick heard when the trio entered the Capitol also wasn't a deterrent. *Id*. at 635. After exiting the Capitol, he remained on the Upper West Terrace until large numbers of police in riot gear eventually cleared it. And he took a victory lap the following day, when he returned to the edge of the Capitol, along with his co-defendants, and memorialized the fortress-like fencing that the Capitol Police had erected overnight. Nothing C. Cusick has done or said since January 6 suggests that he is remorseful for what he did on January 6. A meaningful deprivation of liberty is warranted.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5]  This Court must sentence C. Cusick based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges."  *Gall v. United States*, 552 U.S. 38, 54 (2007).  In short, "the Sentencing Guidelines are themselves an anti-disparity formula."  *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017).  Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).  After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The "open-ended" nature of

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

While no previously sentenced case contains the same aggravating factors present here (and the government submits that there are in fact no mitigating factors in this case), the Court may consider, for reference, the sentence imposed in *United States v. Russell Alford*, No. 21-cr-263 (TSC). Like C. Cusick, Alford was charged with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). Like C. Cusick, Alford was found guilty and convicted on all counts after a five-day jury trial. Like C. Cusick, Alford walked past obvious signs that the Capitol building and grounds were restricted until he found an unobstructed entrance into the Capitol building. Just as Alford remained in the Capitol building until he was forced by police

officers toward the exit, C. Cusick remained on the Upper West Terrace until moments before large teams of riot police cleared the area at 4:30 p.m.  And just as Alford used social media to celebrate his participation in the riot and spread disinformation about the riot, C. Cusick has recorded podcasts and interviews—and solicited donations—based on his participation in the riot. For his offenses on January 6, Alford was sentenced to 12 months of incarceration. A sentence of at least nine months of imprisonment is both necessary and appropriate on the comparable facts of this case.

In *United States v. Rivera*, No. 1:21-cr-0060-CKK, the defendant was convicted of four misdemeanor offenses after a bench trial. *See* Findings of Fact and Conclusions of Law, *Rivera*, No. 1:21-cr-0060-CKK, ECF No. 62.  The evidence showed that Rivera livestreamed his presence in the Capitol and "He urged his followers watching his Facebook livestream to share his livestream with their friends and followers" and proclaimed he was "about to take [his] ass to the middle of the [United] State[s] Capitol." *See* Sentencing Memorandum, *Rivera*, No. 1:21-cr-0060-CKK, ECF No. 69, pg. 5.  Rivera announced to his followers that MPD officers were firing pepper spray at the rioters.  *Id.*, at 7.  Rivera saw rioters climbing a wall and shouted at them, "there's an easier way up!"  *Id*.  Rivera engaged in no violence in the Capitol, and left after approximately 20 minutes.  Rivera was convicted of the same four charges of which the defendant stands convicted. The Court sentenced Rivera to eight months in prison.  *Rivera*, No. 1:21-cr-0060-CKK, ECF. 82.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize

and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.   Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property ... including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because C. Cusick was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664.  *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both the VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA).  Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury.  *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b).  Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim.  *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).  The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[6]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for [his or her] individual contribution

---

[6] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

to the victims' total losses.  *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"); *see also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").  *Cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require C. Cusick to pay $500 in restitution for his convictions on Counts 1 and 2.  This amount fairly reflects C. Cusick's role in the offense and the damages resulting from his conduct.  Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property.  Accordingly, such a restitution order avoids sentencing disparity.

## VI.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors.  Balancing these factors, the government recommends that this Court sentence C. Cusick to nine months of

incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, but is not greater than necessary.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      */s/ Sonia W. Murphy*
SONIA W. MURPHY
D.C. Bar. No. 483072
Trial Attorney
United States Department of Justice, Civil Division
    Detailed to the D.C. U.S. Attorney's Office
601 D Street NW
Washington, D.C. 20530
(202) 305-3067
sonia.murphy@usdoj.gov

FRANCESCO VALENTINI
D.C. Bar No. 986769
Senior Counsel, Capitol Siege Section
U.S. Attorney's Office for the District of Columbia
601 D Street NW
Washington, D.C. 20530
(202) 598-2337
francesco.valentini@usdoj.gov