**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-575-03 (JDB)** |
| **v.** | : | |
| | : | |
| **JAMES VARNELL CUSICK, JR.** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence defendant James Varnell Cusick, Jr. to seven months of incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution. The government's recommended sentence is within the 6- to 12-month guideline range as calculated by the government and the United States Probation Office.

I.     **Introduction**

Defendant James Cusick, Jr., a 74-year-old ordained minister, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

1

After a jury trial, J. Cusick was convicted of entering or remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1); disorderly or disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2); disorderly or disruptive conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  As explained in more detail herein, a sentence of seven months of incarceration, within the applicable Guidelines range, is appropriate in this case for multiple reasons.  *First*, on January 6, 2021, J. Cusick decided to unlawfully enter the Capitol's restricted area—and then the Capitol building—knowing full well that the certification of the electoral college vote was supposed to take place at the U.S. Capitol that day.  *Second*, as he approached the Capitol building, J. Cusick chose to ignore unmistakable proof of the forcible nature of the riot – proof that included shattered glass panes near the Senate Wing Door, a blaring alarm sound, and scores of officers converging on the Capitol just as J. Cusick and his companions were about to enter.  *Third*, J. Cusick testified at trial that he served in the United States Army, which makes it even more troubling that he would betray the Military's core values—including the protection of the Nation's democratic institutions—and participate in an attack on our democracy.

The Court must also consider that J. Cusick's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol building, and disrupt the proceedings.  Here, the facts and circumstances of J. Cusick's crime support a sentence of seven months in prison.

---

million) as reflected in this memorandum.  However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary repetition, the government refers to the general summary of the attack on the U.S. Capitol set forth in the Presentence Report.  PSER (ECF No. 115) at ¶¶ 11-17.

### ***Defendant J. Cusick's Role in the January 6, 2021 Attack on the Capitol***

On January 5, 2021, J. Cusick traveled with his co-defendants, his son, Casey Cusick, and friend, David John Lesperance, from his home in Florida to Washington, D.C. to protest the results of the 2020 presidential election.  J. Cusick had "strong feelings" that there had been "irregularities" in connection with the 2020 presidential election.  Trial Tr. 780-781, 807.  So, on the morning of January 6, J. Cusick and his co-defendants went to the Ellipse to hear the former President speak at the "Stop the Steal" rally.  From there, the three started making their way towards the Capitol grounds, approaching from the west.  J. Cusick was fully aware that, on that day, Congress was supposed to convene at the Capitol to certify the results of the 2020 presidential election.  *Id.* at 804, 806.

As the three advanced towards the Capitol building, Lesperance was recording the group's progress on his cell phone.  *See* GEX 206-208.  The trio saw unmistakable signs that a violent riot was unfolding at the Capitol.  They walked right by the remnants of snow fencing that had been used to protect the restricted area around the Capitol.  J Cusick and his co-defendants ignored the torn-up barrier and continued toward the Capitol building.



**Figure 1: Screenshot from Lesperance's
cell phone video (GEX 206 at 1:49)**

A few seconds later, Casey Cusick turned to his father and Lesperance and exclaimed, evidently in disbelief: "Whoa.  Someone just fell from the wall!  Someone fell from the top of the wall!"  GEX 206 (2:00 – 2:04).  Lesperance, who was focused on a different rioter, initially disagreed: "No, he's hanging on the edge.  He's there.  He's still there."  GEX 206 (2:04 – 2:16). After some more debate about who had fallen off and who was still hanging, and after joining in other rioters' chants, the three reached the outer wall of the Upper West Terrace.  GEX 207 (0:01 – 0:25).



**Figure 2: Screenshot from Lesperance's
cell phone video (GEX 207 at 0:20)**

From the West Front, the Cusicks and Lesperance made their way up the Capitol's front steps and on to the Upper West Terrace.  Along the way, they walked past a set of bike racks that Capitol Police had used as barricades.  GEX 208 (0:25 to 0:35).  At least one of those barricades still bore an "Area Closed" warning sign.   As they walked towards the Capitol Building, they came within a few yards of a large line of police officers who were converging on the Capitol. The Cusicks and Lesperance pressed on.

 

**Figure 3: Screenshot from Lesperance's cell phone video showing barricades and an "AREA CLOSED" sign (GEX 208 at 0:31)**   **Figure 4: Screenshot from Lesperance's cell phone video showing officers in riot helmets entering the Capitol (GEX 208 at 2:19)**

J. Cuisck, who wore a white turtleneck, black jacket, and white hat, and his co-defendants entered the Capitol building at 3:09 p.m. through the Senate Wing Door.  Just moments earlier, Lesperance had taken a photograph of J. Cusick against the backdrop of a shattered window.   As J. Cusick was walking into the Capitol building, his son Casey—who was following close behind—exclaimed, "Pepper spray, Dad!"  GEX 211 (at 0:01 to 0:05).  Inside the Capitol, the Cusicks and Lesperance were faced with a line of police officers in riot gear.  They also heard a piercing alarm sound, which had been triggered by the emergency exit-only door through which they had entered.  They proceeded nonetheless.

 

**Figure 5: Photo of J. Cusick from Lesperance's iCloud account (GEX 228)**        **Figure 6: Screenshot from USCP surveillance video showing J. Cusick (red circle) as he entered the Capitol (GEX 101A, p. 1, at 3:09:47 p.m.)**

Once inside, the Cusicks and Lesperance turned away from the line of police officers and towards the center of the Capitol. They walked south through the Small Rotunda, the Crypt, the Memorial Door lobby, and the House Wing Doors, which are located on the opposite side of the Capitol building. Shortly thereafter, J. Cusick and his companions turned around and began retracing the same route. Once again, they passed a group of police officers.



**Figure 7: Screenshot from USCP surveillance video (GEX 105A, p. 2, at 3:13:32 p.m.)**

Once back in the Crypt, the trio spent several minutes together before briefly separating, as J. Cusick looked for a bathroom. All three defendants ultimately ended up back at the Senate

Wing Doors.   J. Cusick exited at 3:20 p.m., approximately 11 minutes after he had entered. Lesperance and Casey Cusick exited together shortly thereafter at 3:24 p.m.  On their way out, all three were again surrounded by Capitol Police officers in riot gear, who were actively channeling the crowd out of the Capitol building.



**Figure 8: Screenshot from USCP surveillance video**
**(GEX 101 at 12:09, 3:20:09 p.m. on 1/6/21)**

When the defendants left the Capitol building, they did not leave the Capitol grounds. Instead, they remained on the Upper West Terrace for approximately one more hour – until a large number of police officers in riot gear cleared the area at about 4:30 p.m.  As the defendants remained on the Upper West Terrace, Lesperance recorded more videos on his cell phone.  *See, e.g.*, GEX 218 (cell phone video from Lesperance's iCloud account recorded at 3:04:37 p.m., showing a line of police officers in riot gear starting to clear the Upper West Terrace), GEX 219 (cell phone video from Lesperance's iCloud account recorded at 4:25:26 p.m., still showing the Upper West Terrace).

The following day, on January 7, 2021, the Cusicks and Lesperance returned to the edge of the Capitol, as they drove by the United States Supreme Court on the east side of the Capitol. Once on site, Lesperance again used his cell phone to memorialize the scene. This time, Lesperance's videos showed an eight-foot, unscalable fence, which the Capitol Police had erected overnight to protect the United States Capitol in the wake of the January 6 attack. *See* GEX 221-223; Trial Tr. 345-348, 459-460, 499-500.

In June 2023, shortly before trial in this case, J. Cusick recorded a podcast with his son and codefendant, Casey Cusick, in observance of Father's Day. In the podcast, which is titled "Father's Day Special" and is publicly available at https://podcasts.apple.com/za/podcast/fathers-day-special/id1591295684?i=1000617315598, the Cusicks discussed at length their participation in the January 6 attack. J. Cusick falsely claimed that, when he arrived to the Capitol, "[t]here was no police outside at all, none" and that the January 6 riot was "like a family picnic, a 'We love America' kind of thing." *Id.* at 26:55 to 27:20. He also asserted—with respect to the rioters who climbed the walls of the Capitol—that he "didn't really pay much attention to the people climbing, 'cause you know I'm taking groups, kids, everywhere and there's always some fools that want to stupid things like that." *Id.* at 27:20 to 27:40.

### The Charges and the Trial

On June 21, 2021, the United States charged Lesperance by criminal complaint with entering or remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count One); disorderly or disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Two); disorderly or disruptive conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Three); and parading, demonstrating, or picketing

in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Four).  On June 22, 2021, law enforcement officers arrested him at his residence in Melbourne, Florida.

On September 23, 2021, the United States charged Lesperance, Casey Cusick, and James Cusick in a four-count Information with the same offenses.  After a five-day trial that started on July 10, 2023, the jury found all defendants guilty on all counts.  (ECF Nos. 99, 101, 103).[2]

At trial, J. Cusick testified in his defense. On cross-examination, J. Cusick admitted that he knew that, on January 6, Congress was supposed to certify the Electoral College.  Trial Tr. 806, 810-811.  He also admitted that, as he approached the Capitol, he saw rioters climbing the wall leading to the Upper West Terrace.  *Id.* at 816.  He admitted seeing a shattered window next to the Senate Wing Door.  *Id.* at 813-814.  And he admitted that, once inside the Capitol, he could hear a blaring alarm sound.  *Id.* at 812.

But J. Cusick also made numerous outlandish—if not outright false—assertions.  For example, he stated that seeing people climbing the Capitol's perimeter walls when Congress was supposed to certify the Electoral College vote did not give him pause because, on prior visits to Washington D.C., he had seen "school kids" "try to climb walls there and some of the other museums, and he [had] to get them down."  Trial Tr. 816.  He testified that seeing a broken window right next to the Senate Wing Door on a day when Congress was in Joint Session did not give him pause because "I didn't do it.  I didn't break the window."  *Id.* at 790.  He testified that, like his son Casey, he "was not alarmed" by the alarm that welcomed him to the Capitol building because "these things go off and nobody does anything, they get it fixed."  *Id.* at 822.  He testified that he did not hear his son shout, "Pepper spray, Dad!" as they entered the Capitol building, nor did he

---

[2]  J. Cusick's co-defendants are scheduled to be sentenced on the same date as J. Cusick, October 12, 2023.

remember smelling any pepper spray or any other sour stench. *Id.* at 791-792, 821. And he tried to explain away the fact that he returned to the East Side of the Capitol on January 7 as a mere coincidence—saying that it just so happened that he had planned to "show [Lesperance] the Supreme Court, the congressional office buildings, the Hart and Rayburn and Cannon and so on buildings." *Id.* at 802.

### III.    Statutory Penalties

J. Cusick now faces sentencing on four misdemeanor offenses above. As noted by U.S. Probation Office, J. Cusick faces up to one year of imprisonment, one year of supervised release, and a fine of up to $100,000 on Counts One and Two (*see* 18 U.S.C. §§ 1752(b)(2), 3571(b)(5), and 18 U.S.C. § 3583(b)(3)) and up to six months of imprisonment and a fine of up to $5,000 on Counts Three and Fourth (*see* 40 U.S.C. § 5109(b) and 18 U.S.C. § 3571(b)(6)).

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated J. Cusick's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4) | 10 |
| Adjusted Offense Level (Subtotal) | 10 |

Total Offense Level:                                       10

*See* PSR at ¶¶ 34-52.[3]

The U.S. Probation Office calculated J. Cusick's criminal history as a category I, which is undisputed.  Accordingly, J. Cusick is subject to an advisory Guidelines imprisonment range of 6 to 12 months, as the U.S. Probation Office correctly determined.  PSR at ¶ 98.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence.  In this case, as described below, the

---

[3] The U.S. Probation Office only calculated the offense level for Count Two, charging J. Cusick's violation of 18 U.S.C. §1752(a)(2), because it determined that Counts One and Two are grouped, and Count Two has the highest offense level (*see* U.S.S.G. § 3D1.2; PSR at ¶¶ 41, 42). Although the Sentencing Guidelines dictate that the offense level should be calculated for each count before the counts are grouped, *see* USSG §1B1.1(a)(1), (4), the Probation Office nonetheless correctly concluded that J. Cusick's total offense level for Counts One and Two is 10 for the following reasons.  While the Statutory Appendix lists two guidelines for Section 1752 offenses (U.S.S.G. §2A2.4 (Obstructing or Impeding Officers) and §2B2.3 (Trespass)), the "most appropriate" guideline (U.S.S.G. §1B1.2 n.1) for the offense conduct charged in Count Two—which requires proof of "disorderly or disruptive" committed "with intent to impede or disrupt the orderly conduct of Government business or official functions," 18 U.S.C. § 1752(a)(2)—is Guidelines §2A2.4 (PSR at ¶ 39); therefore, the calculation of the offense level for Count Two is correct. .The calculation of the offense level computation for Count One, charging 18 U.S.C. 1752(a)(1) is as follows:

| | |
|---|---|
| **Base Offense Level**: The most applicable guideline for Count One is § 2B2.3 (Trespass). | **4** |
| **Specific Offense Characteristics**: On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B).  Therefore, a two-level enhancement applies. USSG § 2B2.3(b)(1)(A)(vii). | **+2** |
| **Adjusted Offense Level (Subtotal):** | **6** |
| **Total Offense Level** | **6** |

Count Two's resulting total offense level (10) is higher than the total offense level for Count One alone (6). Counts One and Two group, and the offense level for group is the highest offense level for any count in the group. USSG §§ 3D1.2, 3D1.3.

Section 3553(a) factors weigh in favor of seven months of incarceration, to be followed by one year of supervised release, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).  The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021).  While assessing J. Cusick's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.  Notably, for a misdemeanor defendant like J. Cusick, the absence of violent or destructive acts is not a mitigating factor.  Had J. Cusick engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in this case is J. Cusick's disregard of the fact that, at the time of his offenses, his conduct would result in the delay of Congress' certification of the Electoral College vote.  As he made his way to the Capitol, J. Cusick chose to ignore the violence and mayhem.  J. Cusick also ignored the unmistakable proof of the forcible nature of the riot – indications ranging from the fact that rioters were climbing the Capitol's outer walls to the shattered glass panes littering the Capitol's floor near the Senate Wing Door, and from the fact that scores of officers were converging on the Capitol in riot helmets to the high-pitch sound of the alarm that welcomed J. Cusick and his companions to the Capitol.  And J. Cusick's conduct after January 6 is aggravating.  J. Cusick returned to the scene of the riot the following day, on January 7.  Together, these factors establish the clear need for a sentence of seven months of incarceration.

### B.  J. Cusick's History and Characteristics

J. Cusick, who is 74 years old, is an ordained minister.  PSR at ¶ 65.  Earlier in his life, J. Cusick was enlisted in the United States Army. [4]  *Id.* at ¶ 83.  J. Cusick and his wife were married for approximately 40 years before his wife passed away in 2012.  *Id.* at ¶ 59.  J. Cusick has four adult children.  *Id.*

J. Cusick testified at trial that, as a Pastor and founder of a Christian school, he had visited the Capitol "maybe a dozen" times with school-aged children.  Trial Tr. at 778.  Based on those experiences alone, J. Cusick was well aware of the sanctity of the Capitol building and, presumably, of the Capitol's security protocols as well.  As a pastor, moreover, J. Cusick is also a leader within his community.  Nonetheless, J. Cusick participated in the riot on January 6.

J. Cusick's prior military service, though laudable, makes his choices on January 6 even more troubling.  As noted, in his youth, J. Cusick enlisted in the United States Army.  J. Cusick served during Vietnam and was awarded a Purple Heart and a Bronze Star.[5]  Given that past, it is troubling that J. Cusick would betray the Military's core values—including the protection of the Nation's democratic institutions—and participate in an attack on our democracy.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I

---

[4]  This information is based on the defendant's statements to the United States Probation Officer. The defendant did not provide any supporting documentation to the Probation Officer.  PSR ¶ 68.
[5]  *See* n. 4, supra.

don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others?  Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur.  And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again.").  This

was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

　　　*Specific Deterrence*

　　　The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a meaningful term of incarceration.  J. Cusick admitted to seeing the broken window before entering the Capitol, and yet he was undeterred.  *Id*. at 798, 813.  And the loud, blaring alarm that J. Cusick heard when the trio entered the Capitol also wasn't a deterrent.  *Id*. at 792, 821.  After exiting the Capitol, he remained on the Upper West Terrace until large numbers of police in riot gear eventually cleared it.  And he took a victory lap the following day, when he returned to the edge of the Capitol, along with his co-defendants.  Nothing J. Cusick has done or said since January 6 suggests that he is remorseful for what he did on January 6.  A meaningful deprivation of liberty is warranted.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

　　　As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[6]  This

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Court must sentence J. Cusick based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges."  *Gall v. United States*, 552 U.S. 38, 54 (2007).  In short, "the Sentencing Guidelines are themselves an anti-disparity formula."  *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).  After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "As the qualifier

'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

While no previously sentenced case contains the same aggravating factors present here (and the government submits that there are in fact no mitigating factors in this case), the Court may consider, for reference, the sentence imposed in *United States v. Russell Alford*, No. 21-cr-263 (TSC). Like J. Cusick, Alford was charged with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). Like J. Cusick, Alford was found guilty and convicted on all counts after a five-day jury trial. Like J. Cusick, Alford walked past obvious signs that the Capitol building and grounds were restricted until he found an unobstructed entrance into the Capitol building. Finally, just as Alford remained in the Capitol building until he was forced by police officers toward the exit, J. Cusick remained on the Upper West Terrace until moments before large teams of riot police cleared the area at 4:30 p.m.

One distinction between the cases is that, whereas Alford used social media to celebrate his participation in the riot and spread disinformation about the riot, J. Cusick does not appear to

have a social-media footprint.  But J. Cusick still seized on his own opportunity to publicly celebrate the riot, spread lies about the Capitol Police's actions, and disseminate disinformation about the January 6 attack when, in the "Father's Day Special" podcast he recorded with his son Casey Cuisck, he claimed that when he arrived to the Capitol, "[t]here was no police outside at all, none" and that the January 6 riot was "like a family picnic, a 'We love America' kind of thing." Furthermore, unlike Alford, J. Cusick returned to the edge of the Capitol on January 7, where his co-defendant Lesperance recorded videos of the unscalable fencing that had been erected overnight.  For his offenses on January 6, Alford was sentenced to 12 months of incarceration. A sentence of seven months of imprisonment is both necessary and appropriate on the facts of this case.

In *United States v. Rivera*, No. 1:21-cr-0060-CKK, the defendant was convicted of four misdemeanor offenses after a bench trial.  *See* Findings of Fact and Conclusions of Law, *Rivera*, No. 1:21-cr-0060-CKK, ECF No. 62.  The evidence showed that Rivera livestreamed his presence in the Capitol and "He urged his followers watching his Facebook livestream to share his livestream with their friends and followers" and proclaimed he was "about to take [his] ass to the middle of the [United] State[s] Capitol."  *See* Sentencing Memorandum, *Rivera*, No. 1:21-cr-0060-CKK, ECF No. 69, pg. 5.  Rivera announced to his followers that MPD officers were firing pepper spray at the rioters.  *Id*., at 7.  Rivera saw rioters climbing a wall and shouted at them, "there's an easier way up!"  *Id*.  Rivera engaged in no violence in the Capitol, and left after approximately 20 minutes.  Rivera was convicted of the same four charges of which the defendant stands convicted. The Court sentenced Rivera to eight months in prison.  *Rivera*, No. 1:21-cr-0060-CKK, ECF. 82.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

### V.      Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case.  Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).  First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C.  § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096.  The

MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted).  Because J. Cusick was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664.  *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both the VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA).  Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury.  *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b).  Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim.  *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate."  *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).  The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[7]

---

[7] Both statutes permit the sentencing court to decline to impose restitution where doing so will

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for [his or her] individual contribution to the victims' total losses.  *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"); *see also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").  *Cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require J. Cusick to pay $500 in restitution for his convictions on Counts 1 and 2.  This amount fairly reflects J. Cusick's role in the offense and the damages resulting from his conduct.  Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of

---

"complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence J. Cusick to seven months of incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, but is not greater than necessary.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: */s/ Sonia W. Murphy*
SONIA W. MURPHY
D.C. Bar. No. 483072
Trial Attorney
United States Department of Justice, Civil Division
    Detailed to the D.C. U.S. Attorney's Office
601 D Street NW
Washington, D.C. 20530
(202) 305-3067
sonia.murphy@usdoj.gov

FRANCESCO VALENTINI
D.C. Bar No. 986769
Senior Counsel, Capitol Siege Section
U.S. Attorney's Office for the District of Columbia
601 D Street NW
Washington, D.C. 20530
(202) 598-2337
francesco.valentini@usdoj.gov